**In re Trisza Leann RAY, Debtor.**

**Trisza Leann Ray, Plaintiff,**

v.

**The University of Tulsa, Works & Lentz, Inc., an Oklahoma professional corporation, and Works & Lentz of Tulsa, Inc., an Oklahoma professional corporation, Defendants.**

**Bankruptcy No. 98–01935–M.**
**Adversary No. 00–0157–M.**

United States Bankruptcy Court,
N.D. Oklahoma.

Sept. 12, 2002.

---

Mark D. Lyons, Tulsa, OK, for plaintiff.

Kenneth G.M. Mather, Tampa, FL, Fred C. Cornish, Tulsa, OK, for defendants.

## MEMORANDUM OPINION

TERRENCE L. MICHAEL, Bankruptcy Judge.

THIS MATTER comes before the Court pursuant to the Motion for Attorney's Fees, as supplemented (the "Fee Motion"), filed by Trisza Leann Ray, Plaintiff herein ("Plaintiff" or "Ms. Ray"), and the Re-

sponses to the Motion for Attorney's Fees filed by the University of Tulsa (the "University"). The following findings and conclusions are made pursuant to Bankruptcy Rule 7052 and Federal Rule of Civil Procedure 52.

## Jurisdiction

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C.A. § 1334(b).[1] Reference to the Court of this adversary proceeding is proper pursuant to 28 U.S.C.A. § 157(a). This is a core proceeding as contemplated by 28 U.S.C.A. § 157(b)(2)(A) and (1).

## Background

The facts which give rise to the underlying dispute between Ms. Ray and the University have been set out by this Court in a previous memorandum opinion. *See Ray v. University of Tulsa (In re Ray)*, 262 B.R. 544 (Bankr.N.D.Okla.2001) (hereafter "*Ray I*"). In *Ray I*, this Court deter-

mined that the University violated the discharge injunction contained in § 524 when it sought to collect unpaid tuition from Ms. Ray. The issue of the amount of damages (if any) to be assessed against the University was not determined in *Ray I*; instead, that matter was left for further discovery and trial.

During the course of this adversary proceeding, Ms. Ray has propounded certain discovery upon the University. On December 11, 2000, Ms. Ray filed a motion with this Court (the "First Motion to Compel") seeking an order directing the University to answer specified interrogatories.[2] Thereafter, on February 16, 2001, this Court entered its order striking the First Motion to Compel pending a ruling on the threshold issue of whether the University violated the discharge injunction of § 524.[3] *See Docket No. 33*. On May 8,

1. Unless otherwise noted, all statutory references are to sections of the United States Bankruptcy Code, 11 U.S.C.A. § 101 *et seq.* (West 2002).

2. The relevant interrogatories were:
 Interrogatory No. 2: Identify by name, date of birth and last known address and telephone number, each and every University of Tulsa student or former student who, following enrollment and/or attendance at the university, received a discharge in bankruptcy, and after such discharge, from whom, defendant, its employees, agents or any person or entity on behalf of defendant, has collected or attempted, after such discharge, to collect any monies which were listed as a debt owed to defendant to be discharged in that person's bankruptcy.
 Interrogatory No. 3: As to each such occasion identified in Interrogatory No. 2, give the case caption of the student's bankruptcy case and explain in detail all steps the University took after the student received a discharge to collect or attempt to collect the debt(s) listed in the student's bankruptcy schedule.
 Interrogatory No. 4: As to each student listed in Interrogatory No. 2, and as to all steps taken in Interrogatory No. 3, identify

all persons at the University who authorized, approved of, participated in and/or had knowledge of the collection of, or the attempt to collect debt(s) that had been listed in a student's bankruptcy schedule for discharge. As to each such person identified, explain what he or she authorized, what he or she approved, how he or she participated in the collection or attempt to collect the debts and/or what knowledge he or she had of the collection or attempt to collect the debt(s) set out above.
 Interrogatory No. 6: As to each such person and each incident described in interrogatories 2 and 3, explain which steps were taken to object to the discharge of the debt in bankruptcy and what the court's ruling was with regard to each person and case. In your answer, specifically note whether anyone on behalf of the University appeared at any creditor's meetings, filed any pleadings, or made any appearances in these cases to object to the discharge of the student's debt(s).
 *See Docket No. 13.*

3. The Court found that it made little sense to consider the First Motion to Compel unless and until it was determined that the University's conduct violated the discharge injunction.

2001, this Court entered its memorandum opinion and order in *Ray I*, finding that the discharge injunction had been violated by the University.

On May 29, 2001, Ms. Ray filed an application with the Court to resubmit the First Motion to Compel. *See Docket No. 51.* Said application was granted, and a telephonic hearing on the First Motion to Compel was held on June 29, 2001. The Court concluded that the interrogatories which were the subject of the First Motion to Compel were overly broad because they contained no time limitations and could be read to require the University to produce information dating back to the University's inception. Accordingly, the Court denied the First Motion to Compel without prejudice. *See Docket No. 54M.*[4]

On August 15, 2001, Ms. Ray filed another motion to compel (the "Second Motion to Compel"), in which she again sought an order requiring the University to answer certain interrogatories and requests for production of documents (hereafter "Disputed Discovery").[5] The Univer-

4. Counsel for Ms. Ray seems to contend that the Court did not overrule the First Motion to Compel, but instead ordered Ms. Ray to narrow the scope of her discovery. The record does not support this contention, as shown in the following excerpt from the Court's bench ruling:

> The problem that I have with the interrogatories and their relevance is that there is no time frame set up in these interrogatories. And I'm not inclined to rewrite the interrogatories to create a time frame. If I did that I would probably get the time frame that the plaintiff did not want. As written, if I enter an order compelling responses to these interrogatories as written, which is what I am being asked to do, the University of Tulsa basically has to go back to its inception or the inception of the 1898 Bankruptcy Act, or perhaps a predecessor law, and find every bankruptcy case that it may have ever had involving one of its students. And that [request] is too broad and such an inquiry is not relevant or reasonably calculated to lead to the discovery of admissible evidence.
>
> * * *
>
> The interrogatories as drafted are overly broad and are not reasonably calculated to lead to the discovery of admissible evidence because of the fact that they contain no time limitations. And on that basis the motion to compel is overruled and the plaintiff's [sic] objection is sustained.

*See Docket No. 159,* p. 5, lines 9–21 and p. 6, lines 6–10.

5. The relevant interrogatories and document requests were:

> Interrogatory No. 16: Identify by name, date of birth and last known address and telephone number, each and every University of Tulsa student or former student who, following enrollment and/or attendance at the university, received a discharge in bankruptcy *after March 9, 1993,* and after such discharge, from whom, defendant, its employees, agents or any person or entity on behalf of defendant, has collected or attempted, after such discharge, to collect any monies which were listed as a debt owed to defendant to be discharged in that person's bankruptcy.
>
> Interrogatory No. 17: As to each such occasion identified in Interrogatory No. 16, give the case caption of the student's bankruptcy case and explain in detail all steps the University took after the student received a discharge to collect or attempt to collect the debt(s) listed in the student's bankruptcy schedule.
>
> Interrogatory No. 18: As to each student listed in Interrogatory No. 16, and as to all steps taken in Interrogatory No. 17, identify all persons at the University who authorized, approved of, participated in and/or had knowledge of the collection of, or the attempt to collect debt(s) that had been listed in a student's bankruptcy schedule for discharge. As to each such person identified, explain what he or she authorized, what he or she approved, how he or she participated in the collection or attempt to collect the debts and/or what knowledge he or she had of the collection or attempt to collect the debt(s) set out above.
>
> Interrogatory No. 19: As to each such person and each incident described in interrogatories 16 and 17, explain which steps were taken to object to the discharge of the debt in bankruptcy and what the court's

sity objected to the Disputed Discovery on three bases: (1) the Disputed Discovery was irrelevant; (2) the Disputed Discovery was unduly burdensome; and (3) Production of the requested information would be violative of the Family and Education Privacy Rights Act of 1974, 20 U.S.C.A. § 1232g (West 2001) ("FEPRA").

A hearing was held on the Second Motion to Compel on September 17, 2001. In support of its position, the University offered exhibits and the testimony of two witnesses, Peter Sandman and Yolanda Taylor. Mr. Sandman, the Director of Financial Services for the University and the individual responsible for the collection of accounts due to the University, testified to his belief that it would take in excess of one month for the University to review its files and prepare responses to the Disputed Discovery. However, Mr. Sandman admitted that the University had undertaken no effort beyond a cursory review of the files in his office to respond to the Disputed Discovery. Mr. Sandman also testified that he had no idea how many University students had filed bankruptcy since March 9, 1993, the operative date in the Disputed Discovery. Ms. Taylor, an Associate Vice President and Dean of Students at the University, testified to her belief that the University had a duty under FEPRA to inform all affected students prior to dissemination of any of their student records, including those records requested in the Disputed Discovery.

On November 8, 2001, this Court entered an order granting the Second Motion to Compel and requiring the University to answer the Disputed Discovery within thirty days. *See Docket No. 81.* In making its ruling, this Court rejected each of the University's arguments. With respect to the issue of relevance, this Court noted that the University pled as a good faith defense that it had complied with an unpublished decision entered by this Court by the Honorable Mickey D. Wilson in a case entitled *"The University of Tulsa v. Quanah Wright"* (the *"Wright* Decision") entered March 9, 1993. The Court determined that evidence which would establish whether the University acted in accordance with the *Wright* Decision was relevant to its good faith defense. With respect to the alleged burden of the Disputed Discovery, the Court found, based upon Mr. Sandman's testimony, that the University had made little, if any, effort to quantify the actual amount of burden involved in its response. Furthermore, the Court noted that creditor compliance with § 524 is essential to the operation of the Bankruptcy Code. If the University acted in willful disregard of the discharge injunction, proper discovery was essential to the proper operation of the Bankruptcy Code.[6] With respect to

---

ruling was with regard to each person and case. In your answer, specifically note whether anyone on behalf of the University appeared at any creditor's meetings, filed any pleadings, or made any appearances in these cases to object to the discharge of the student's debt(s).
Document Request No. 20: Any and all documents relating to or reflecting an agreement with any collection agency or law firm for the attempted collection of monies from any student identified in Interrogatory No. 16.

Document Request No. 21: Any and all documents regarding the collection or attempted collection after March 9, 1993, of the debt, loan, or any other financial obligation owed to defendant by any student identified in interrogatory No. 16.
*See Docket No. 56.*

6. The position taken by the University seemed to be that "because we don't keep track of what we do in particular bankruptcy cases, the Court should not require us to go back and figure out what we did, how we did it and who we did it to." Such a position is untenable. The Court believes that creditors who

the University's objections based upon FEPRA, the Court found that all issues relating to FEPRA could be resolved through the issuance of a Court order requiring production of the records and disclosure of the information at issue in compliance with 34 C.F.R. § 99.31(a)(9) (West 2001).[7]

The University attempted to appeal the adverse decision on the Second Motion to Compel. In fact, it filed two such appeals. In a report and recommendation entered on January 24, 2002, United States Magistrate Judge Sam Joyner recommended that the first appeal be dismissed. *See Docket No. 115.* In doing so, Judge Joyner noted that he could find no authority to support the position taken by the University; namely, that a discovery order was the proper subject of an interlocutory appeal. Shortly thereafter, the University dismissed its second appeal. *See Docket No. 118.* Judge Joyner's report and recommendation was adopted by the Honorable Sven Erik Holmes, United States District Judge for the Northern District of Oklahoma, without objection. *See Docket No. 122.*

Notwithstanding the disposition of the appeals and the pending order compelling the University to answer interrogatories and produce documents, the discovery disputes between the parties continued unabated.[8] Having received no response to the Disputed Discovery, counsel for Ms. Ray filed an Application for Citation of Contempt against the University on March 5, 2002 (the "Application for Contempt"). *See Exhibit 39.* On April 8, 2002, the University served upon counsel for Ms. Ray its "Responses" to the interrogatories and requests for production which it had been ordered to answer. *See Exhibits 43 and 44.* In those responses, the University realleged the objections which had been overruled by the Court. In addition, the University stated that it would produce "non-privileged and non-confidential documents" responsive to the interrogatory and/or request for production at a later date in place of substantive answers to the interrogatories.

The Court scheduled a hearing on the Application for Contempt on June 20, 2002. On June 18, 2002, counsel for the University served supplemental answers to the in-

---

undertake collection efforts in the face of a bankruptcy case must be able to tell other parties and the Court what they did and when they did it.

7. This section provides that

 (a) An educational agency or institution may disclose personally identifiable information from an education record of a student without the consent required by § 99.30 if the disclosure meets one or more of the following conditions:

 \* \* \*

 (9)(i) The disclosure is to comply with a judicial order or lawfully issued subpoena.
 (ii) The educational agency or institution may disclose information under paragraph (a)(9)(i) of this section only if the agency or institution makes a reasonable effort to notify the parent or eligible student of the

order or subpoena in advance of compliance, so that the parent or eligible student may seek protective action, unless the disclosure is in compliance with—
 (A) A Federal grand jury subpoena and the court has ordered that the existence or the contents of the subpoena or the information furnished in response to the subpoena not be disclosed; or
 (B) Any other subpoena issued for a law enforcement purpose and the court or other issuing agency has ordered that the existence or the contents of the subpoena or the information furnished in response to the subpoena not be disclosed.

8. The evidence presented to the Court established that counsel for Ms. Ray made several attempts to resolve discovery disputes without resorting to Court involvement, but was unable to do so. *See Exhibits 52–58.*

terrogatories and requests for production which it had been ordered to answer in November of 2001. *See Exhibit 70.* These answers were substantive in nature, although some issue as to their completeness remains. In addition, the responses to the request for production indicate that documents responsive to the requests were available for inspection, and had previously been made available sometime in May of 2002. At the June 20, 2002, hearing, the University presented evidence that it had delivered to counsel for Ms. Ray approximately 136 student files responsive to its discovery requests.

At the close of the June 20, 2002, hearing, the Court allowed the parties to present written closing argument with respect to the Application for Contempt. After consideration of the same, the Court entered a bench ruling on August 14, 2002. In making its ruling, the Court found that the Application for Contempt sought relief in the nature of criminal contempt, due to the fact that, at long last, the University had substantially complied with the discovery requests. Given the uncertain nature of the ability of bankruptcy courts to punish an act of criminal contempt committed outside the presence of the court, and the availability of alternative remedies under Federal Rule of Civil Procedure 37, the Court declined to find the University in contempt.

On November 16, 2001, Ms. Ray filed a Motion (hereafter "Fee Motion") for an award of attorney's fees under Federal Rule of Civil Procedure 37. Supplements to the Fee Motion were filed on March 7, 2002, June 19, 2002, and August 8, 2002. In the Fee Motion, Ms. Ray seeks an award of $36,892.31 in fees and costs for work performed between November 14, 2000, and June 19, 2002. In addition, Ms. Ray seeks an additional award for time spent at the August 14, 2002, hearing on the Fee Motion.

The evidence received at the August 14, 2002, hearing included expert testimony regarding the reasonableness of the fees incurred by counsel for Ms. Ray. Ms. Ray offered the testimony of Mr. William Grimm, a litigator with over twenty-nine years of experience, with considerable experience in bankruptcy matters. Mr Grimm testified to his belief that both the rates sought by counsel for Ms. Ray as well as the time spent pursuing the First and Second Motions to Compel were reasonable. Mr. Grimm testified to his belief that the discovery disputes between the University and Ms. Ray constituted one continuous matter, and that the time spent upon the First Motion to Compel should be compensated.

The University countered the testimony of Mr. Grimm with the testimony of Mr. Mark Craige. Mr. Craige is an attorney with over twenty years experience, mostly in the bankruptcy arena. Mr. Craige testified to his belief that a large portion of the time spent by counsel for Ms. Ray should not be the subject of a fee award. Relying largely upon this Court's decision in *In re Reconversion Technologies, Inc.,* 216 B.R. 46 (Bankr.N.D.Okla.1997), Mr. Craige testified that many of the time descriptions contained in the Fee Motion were insufficient, that there was significant duplication of effort between Mr. Lyons and Mr. David O'Meilia, a former partner of Mr. Lyons, that the hourly rates sought by Mr. Lyons and Mr. O'Meilia ($200 per hour for office time and $225 per hour for time spent in court) were excessive and that no compensation should be awarded for matters in which Ms. Ray failed to prevail; namely, the First Motion to Com-

pel and the Motion for Contempt. Mr. Craige went on to testify to his belief that if the Court were inclined to award fees, the maximum amount of fees and expenses which could be awarded was $7,226.00, consisting of approximately 38.75 hours at $175 per hour plus expenses. In addition, Mr. Craige also testified that if the Court was inclined to award fees, the award should include the time spent in preparing and arguing the Fee Motion.

## Discussion

■ The awarding of fees and/or the imposition of sanctions for failure to provide discovery are governed in large part by Rule 37 of the Federal Rules of Civil Procedure ("Rule 37"), which is made applicable to this adversary proceeding by Bankruptcy Rule 7037.[9] Rule 37(a) governs fee awards in making motions to compel discovery responses. Under Rule 37(a)(4)(A)

> If the motion was granted ... the court *shall,* after ... opportunity to be heard, require the party ... whose conduct necessitated the motion ... to pay the moving party the reasonable expenses incurred in making the motion, including attorneys fees, *unless the court finds ... that the opposing party's nondisclosure ... was substantially justified, or*

> that other circumstances make an award of expenses unjust.

FED.R.CIV.P. 37(a)(4)(A) (emphasis added). Rule 37(b)(2) governs fee awards for failure to comply with an order compelling discovery. It provides that

> If a party ... fails to obey an order to provide or permit discovery ... the court shall require the party or the attorney advising that party or both to pay reasonable expenses, including attorney's fees, caused by the failure, unless the court finds that the failure was substantially justified or that other circumstances make an award of expenses unjust.

FED.R.CIV.P. 37(b)(2). Under both provisions, an award of fees and expenses must be "reasonable." This Court believes that the best way to calculate an appropriate fee award is to begin with the hours for which compensation is sought, determine a reasonable hourly rate, and then deduct from the time sought time which the Court finds to be non-compensable under the strictures of Rule 37.[10]

The total hours incurred as detailed in the Fee Motion (including spent in preparation and attendance at the August 14, 2002 hearing on the Fee Motion) as well as the corresponding hourly rates sought for each participant are as follows:

---

**9.** This is not to suggest that courts do not have inherent power to deal with discovery disputes. As the Supreme Court explains, "[c]ourts ... are universally acknowledged to be vested, by their very creation, with the power to impose silence, respect, and decorum, in their presence, and submission to their lawful mandates." *Chambers v. NASCO, Inc.,* 501 U.S. 32, 43, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991) (citations and quotations omitted).

**10.** It is important to understand that the Court is only awarding fees at this time under Rule 37. This decision does not preclude counsel for Ms. Ray from seeking an award of fees disallowed herein on another basis, should one exist. With respect to this Court's position on the awarding of attorney's fees as

| | | |
|---|---|---|
| Mr. Lyons: | 129.12 hours [11] | $200 per hour for time spent out of court<br>$225 per hour for time spent in court |
| Mr. Danielson: | 14.45 hours | $200 per hour |
| Mr. O'Meilia: | 24.4 hours | $200 per hour for time spent out of court<br>$225 per hour for time spent in court |
| Ms. King: | 9.0 hours [12] | $150 per hour |
| Ms. Aranda: | .25 hours | $150 per hour |
| Law Clerk: | 88.1 hours | $ 40 per hour |
| Ms. Blackburn: | 8.75 hours | $ 65 per hour (paralegal) |

Mr. Lyons has been licensed to practice law in Oklahoma since 1980, and specializes in commercial litigation. Mr. O'Meilia has been in practice since 1976, while Mr. Danielson was admitted to the Oklahoma bar in 1987. The Court has no information regarding the experience or qualifications of Ms. King. Ms. Blackburn has been employed as a secretary or paralegal for approximately ten years. The Court was given no detailed information regarding the qualifications of the various law clerks who performed tasks outlined in the Motion. The Court assumes for purposes of its decisions that they were (or are) law students employed by counsel for Ms. Ray.

*Hourly Rates*

Each of the experts offered to the Court their views regarding the reasonableness of the hourly rates sought in the Motion. Mr. Grimm testified to his belief that the rates were reasonable, if not low. Mr. Grimm relied in large degree upon a "rate survey" prepared for use in a large Chapter 11 case which was presided over by the other bankruptcy judge in this district. This judge does not have any independent knowledge of the "rate survey," nor was it made a part of the record. According to Mr. Grimm, that "rate survey" indicates that the following hourly rates would fall in the range of reasonableness:

| | |
|---|---|
| Mr. Lyons: | $196–$248/hour |
| Mr. Danielson: | $175–$195/hour |
| Mr. O'Meilia: | $204–$252/hour |
| Ms. Blackburn: | $ 72–$ 83/hour |
| Law Clerks: | $ 64–$ 66/hour |

Mr. Grimm offered no opinion as to a proper rate for Ms. King. Not surprisingly, Mr. Craige held a different view. Mr. Craige, relying upon his experience in bankruptcy courts as well as *Reconversion*, testified to his belief that an hourly rate of $175 would be reasonable for Messrs. Lyons, Danielson and O'Meilia.[13]

The matter of a reasonable hourly rate is a matter left to the discretion of

---

a general matter, counsel are directed to *In re Nichols*, 221 B.R. 275 (Bankr.N.D.Okla.1998).

**11.** This includes 11.45 hours which is not detailed in the Fee Motion, but which Mr. Lyons testified was incurred on August 13 and 14, 2002, in preparation for and attendance at the hearing on the Fee Motion.

**12.** Ms. King is an associate of Mr. Lyons. She testified that this time was spent in preparation for the hearing on the Fee Motion (4 hours), and in attending said hearing for the purpose of questioning Mr. Lyons (5 hours).

**13.** Mr. Craige noted that counsel for Ms. Ray were relatively inexperienced in the area of bankruptcy, and that while their hourly rates

the trial court, based upon the evidence presented in support of and in opposition to the motion for fees, as well as the experience of the court in like matters. The Court, based upon these factors, finds the following hourly rates to be reasonable for purposes of the Motion:

| | |
|---|---|
| Mr. Lyons: | $200 per hour |
| Mr. Danielson: | $175 per hour |
| Mr. O'Meilia: | $200 per hour |
| Ms. Blackburn: | $ 50 per hour |
| Law Clerks: | $ 40 per hour |

The Court declines to award compensation at different hourly rates for Mr. Lyons and Mr. O'Meilia based upon whether time was spent at the office or in court. The Court sees no basis to differentiate between the two types of time spent. Time is rarely well spent in court unless counsel has invested time in preparation for going to court. As noted *infra*, the Court has declined to award any compensation for the time spent by Ms. King and therefore does not attempt to determine an appropriate hourly rate for her services. The Court notes that it has no information in the record from which it could make such a determination.

### The First Motion to Compel

■ Counsel for Ms. Ray seeks an award of fees incurred in filing and prosecuting the First Motion to Compel. The First Motion to Compel was denied because the interrogatories at issue were overly broad, an objection raised by the

University. It is difficult to see how the position of the University, having been sustained by the Court, could not be considered "substantially justified" for purposes of Rule 37(a)(4)(A). Accordingly, the Court declines to award fees for any services relating to the First Motion to Compel. Based upon the Court's review of the Fee Motion, all of the time detailed on pages one through eight of the affidavit of Mark D. Lyons offered in support of the Second Supplement to the Fee Motion would not be compensable. *See Exhibit 71*, Pages 1–8 of the Affidavit of Mark D. Lyons attached thereto. This results in a total reduction of 26.15 hours, consisting of 10.25 hours of Mr. Lyons, 12.35 hours for Mr. O'Meilia, .25 hours for Ms. Aranda,[14] and 3.3 hours in law clerk time.

### The Second Motion to Compel

■ Plaintiff, having prevailed on the Second Motion to Compel, also seeks an award of her fees and expenses incurred in bringing said motion. The University responds by claiming, without further explanation, that its objections were "substantially justified" for purposes of Rule 37(a)(4)(A) and that, as a result, no fees should be awarded. *See Docket No. 91* at p. 6. The University also contends that in the event the Court determines that any fee award is proper, the amount sought is unreasonable and should at a minimum be reduced to the amount determined to be reasonable by Mr. Craige.

might be reasonable in matters of commercial litigation, they were not appropriate where the matters required bankruptcy expertise. Given the fact that Ms. Ray has prevailed on the substantive bankruptcy issue in this case, the Court finds Mr. Craige's analysis unpersuasive.

14. The only entry relating to Ms. Aranda is for one-quarter hour on December 11, 2000,

styled "went to the Bankruptcy Court and filed the Motion to Compel." In the eyes of the Court, the ministerial task of filing a motion constitutes non-compensable overhead, and would not be compensable in any event. *See Blakey v. Continental Airlines, Inc.*, 2 F.Supp.2d 598, 605 (D.N.J.1998); *see also In re Palm Beach Cruises, S.A.*, 208 B.R. 78, 82 (Bankr.S.D.Fla.1997).

Turning first to the issue of "substantial justification," the United States Supreme Court has noted that

In an area related to the present case in another way, the test for avoiding the imposition of attorney's fees for resisting discovery in district court is whether the resistance was "substantially justified," Fed.Rules Civ.Proc. 37(a)(4) and (b)(2)(E). To our knowledge, that has never been described as meaning "justified to a high degree," but rather has been said to be satisfied if there is a "genuine dispute," or "if reasonable people could differ as to [the appropriateness of the contested action][.]"

We are of the view, therefore, that as between the two commonly used connotations of the word "substantially," the one most naturally conveyed by the phrase before us here is not "justified to a high degree," but rather "justified in substance or in the main"—that is, justified to a degree that could satisfy a reasonable person. That is no different from the "reasonable basis both in law and fact" formulation adopted by the Ninth Circuit and the vast majority of other Courts of Appeals that have addressed this issue.

*Pierce v. Underwood,* 487 U.S. 552, 564–565, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988) (citations omitted); *see also Maddow v. Procter & Gamble Co., Inc.,* 107 F.3d 846, 853 (11th Cir.1997) ("Substantially justified means that reasonable people could differ as to the appropriateness of the contested action."); 8A Charles Allen Wright, Arthur R. Miller & Richard L. Marcus, Federal Practice and Procedure § 2288, at 665–666 (2d. ed. 1994) ("[O]pposing a motion is 'substantially justified' if the motion raised an issue about which reasonable people could genuinely differ on whether a party was bound to comply with a discovery rule."). The question is whether any of the three objections to the Disputed Discovery advanced by the University were substantially justified.

With respect to the objection based on relevance, the Court finds that the position of the University was not substantially justified. Federal Rule of Civil Procedure 26(b)(1) provides that

Parties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party, including the existence, description, nature, custody, condition, and location of any books, documents, or other tangible things and the identity and location of persons having knowledge or any discoverable matter. For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action. Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence. All discovery is subject to the limitations imposed by Rule 26(b)(2)(i), (ii), and (iii).

Fed.Rule.Civ.P. 26(b)(1). One of the leading treatises on the issue has noted that:

It may be said generally at this point that the rules allow discovery regarding any matter that is relevant to the subject matter of the action, subject to four limitations. These are: (1) privileged matter is not discoverable; (2) discovery of material obtained in preparation for trial, including expert testimony, is restricted; (3) a physical or mental examination can be ordered for only good cause and only if physical or mental condition is "in controversy;" and (4) as is indicated by the introductory language of Rule 26(b), the court may limit the scope of discovery in accordance with the rules.

To understand the reason for the wide scope of discovery permitted by the fed-

eral rules, it should be kept in mind that a clear distinction is made between the right to obtain information by discovery and the right to use it at the trial. Rule 26(b) allows great freedom in discovery. The Federal Rules of Evidence generally control what may be used at the trial. 8 CHARLES ALLEN WRIGHT, ARTHUR R. MILLER & RICHARD L. MARCUS, FEDERAL PRACTICE AND PROCEDURE § 2007, at 95 (2d ed.1994) (footnotes omitted). Given this broad definition of relevance for discovery purposes, the position taken by the University is untenable. The University has pled its conduct as a good faith defense to the allegations that it violated the discharge injunction. One of the linchpins of the *Wright* Decision was Judge Wilson's ruling that amounts owed the University for items other than tuition were dischargeable. Evidence which would establish whether the University acted in accordance with the *Wright* Decision is relevant (at least for discovery purposes) to its good faith defense. A reasonable person would have difficulty arguing to the contrary.

The University also argued that the discovery sought by Ms. Ray was unduly burdensome. In support of their position, the University offered the testimony of Mr. Sandman, who admitted that he had made no effort other than a review of files in his office to determine the scope of the undertaking necessary to respond to the Disputed Discovery. Such a minimal effort does not support the University's claim of "substantial justification." The Court also rejects the University's argument that, given the relatively small sum allegedly in dispute, it should not have been put to the burden of producing information regarding its treatment of students who have filed bankruptcy and listed the University as a creditor. This Court firmly believes that individuals and entities who seek to collect debts from those who have sought bankruptcy protection have a duty to keep records from which their conduct can be determined. This is especially true where, as here, the party claims that it acted appropriately under the Bankruptcy Code and controlling case law.

The Court also cannot find the University's reliance on FEPRA to be substantially justified. The statute contains an express provision allowing the disclosure of student records upon entry of a court order and notice to the affected students. Indeed, in its objections to the Disputed Discovery, the University did not contend that FEPRA operated as an absolute bar to disclosure of the requested information. Rather, the University stated that

> FEPRA requires that an education institution [sic] obtain prior written consent from an eligible student before the student's education records and information may be disclosed to a third party. The University therefore refuses to produce such information to the Plaintiff unless and until all such affected students are properly notified of the Plaintiff's discovery.

*See Exhibit 18*, Defendant The University of Tulsa's Responses to Plaintiff's Second Interrogatories, dated August 6, 2001, pp. 2–9. Notwithstanding its position, the University apparently made no effort to create a form of the notice required under FEPRA until March 14, 2002. *See Exhibit 56(C)*. Sometime in May of 2002, approximately six months after being ordered to do so, the University produced 136 student files after giving what it considered to be the appropriate notice under FEPRA.

The Court concludes that the position taken by the University with respect to the Disputed Discovery was not "substantially justified" for purposes of Rule 37(a)(4)(A). The same analysis applies to the Court's later conclusions under Rule 37(b). Having made that determination, the Court

must next determine an appropriate fee award. Bankruptcy courts are uniquely qualified in determining the reasonableness of fees and expenses paid to attorneys. Under § 330 a bankruptcy court must make an independent assessment of all fees and expenses when the funds are paid out from the estate. The analytical framework that has been developed by the courts to determine reasonableness under § 330 is complementary to the reasonableness requirement of Rule 37. Thus, this Court believes that cases determining reasonableness of fees under § 330 are applicable in determining reasonable fees under Rule 37.

*Duplication/Time Spent*

█ The Court, in reviewing the Motion, has noted that Mr. O'Meilia and Mr. Lyons often spent time conferring with each other or performing what seem to have been the same tasks. Courts have taken a variety of positions regarding this practice. *See, e.g., In re Witts,* 180 B.R. 171, 173 (Bankr.E.D.Tex.1995) (intra-office conferences billed by more than one member of a firm is unreasonable); *In re Poseidon Pools of America, Inc.,* 180 B.R. 718, 731 (Bankr.E.D.N.Y.1995) (only one attorney may charge for intra-office conference unless adequate explanation given); *In re Beyer,* 169 B.R. 652, 658 (Bankr.W.D.Tenn.1994) (no compensation for multiple attorneys unless counsel can show estate benefitted from "special area of expertise from the respective attorneys."); *In re Jefsaba, Inc.,* 172 B.R. 786, 800 (Bankr.E.D.Pa.1994) (all participants may bill provided requirements of specificity and reasonableness apply); *In re American Intl. Airways, Inc.,* 69 B.R. 396, 400 (Bankr.E.D.Pa.1987) (compensation limited to one participant absent "extraordinary justification"). Even those courts which have allowed the practice have stated that time entries for intra-office conferences will be "intricately scrutinized" and will be disallowed where they involve duplication of effort. *In re Grosswiler Dairy, Inc.,* 257 B.R. 523, 531 (Bankr. D.Mont.2000).

In explanation, Mr. Lyons testified that due to Mr. O'Meilia's impending appointment as United States Attorney for the Northern District of Oklahoma, it was necessary that both Mr. Lyons and Mr. O'Meilia keep themselves fully abreast of all developments in this adversary proceeding. While as a practical matter this may be true, it does not follow that the costs associated with keeping two attorneys fully involved in this matter should be borne by the University. With this thought in mind, the Court declines to award compensation for the following time entries:

| Date | Timekeeper | Hours |
|------|-----------|-------|
| 08/06/01 | DEO | 0.25 |
| 08/10/01 | DEO | 1.50 |
| 08/13/01 | DEO | 0.40 |
| 08/17/01 | DEO | 0.40 |
| 08/20/01 | DEO | 0.25 |
| 08/21/01 | DEO | 2.10 |
| 08/29/01 | DEO | 0.40 |
| 08/31/01 | DEO | 0.50 |
| 09/05/01 | MDL | 0.20 |
| 09/05/01 | DEO | 0.20 |
| 09/05/01 | DEO | 0.50 |
| 09/17/01 | MDL | 2.00 |
| 09/17/01 | MDL | 1.17 |
| 09/18/01 | DEO | 0.25 |
| 11/08/01 | MDL | 0.67 |

Each of the entries set forth above has a "matching" entry by another counsel. The

Court finds that only one counsel's time is properly considered as it makes an award of fees in this matter. This results in a total reduction of 10.79 hours, consisting of 4.04 hours of Mr. Lyons and 6.75 hours for Mr. O'Meilia.

■ The Court also declines to award compensation for the time spent by Ms. King in preparing for and attending the hearing on the Fee Motion. First of all, the Court has no information from which it could determine the reasonableness of the requested hourly rate of $150. In addition, it seems that Ms. King was at the hearing for the sole purpose of questioning Mr. Lyons. The Court does not have sufficient information at its disposal to allow the justification of the time spent.

*Time Not Related to the Motion to Compel*

■ Under Rule 37, fee awards "must be 'just' [and] specifically related to the particular 'claim' which was at issue in the order to provide discovery." *Ins. Corp. of Ireland Ltd. v. Compagnie des Bauxites,* 456 U.S. 694, 707, 102 S.Ct. 2099, 72 L.Ed.2d 492 (1982). The Tenth Circuit refined these requirements when it stated:

> The award of fees and expenses for noncompliance with the rules is discretionary, and the amount and impact of a monetary sanction should depend on the seriousness of the violation and where the fault lies, *i.e.,* with counsel or client. However, in the absence of a finding of bad faith, there must be a sufficient nexus between noncompliance with the rules and the amount of fees and expenses awarded as a sanction.

*Turnbull v. Wilcken,* 893 F.2d 256, 259 (10th Cir.1990) (citations omitted), *reaffirmed in, Olcott v. Delaware Flood Co.,* 76 F.3d 1538, 1557 (10th Cir.1996). Put simply, in order to award fees for a discovery violation, the fees must directly relate to that violation. Fees that are not related to the discovery violation or that would have been incurred in any event are not compensable.

The Court, after reviewing the Motion, declines to award fees for the following time entries:

| Date | Timekeeper | Hours |
|---|---|---|
| 08/13/01 | CLK | 0.67 |
| 08/13/01 | DEO | 1.35 |
| 08/22/01 | MDL | 0.20 |
| 11/08/01 | MDL | 0.67 |
| 11/28/01 | MDL | 0.10 |
| 12/04/01 | MDL | 0.20 |
| 02/01/02 | MDL | 0.20 |
| 02/06/02 | MDL | 0.33 |
| 02/15/02 | MDL | 0.20 |
| 03/27/02 | MDL | 0.33 |
| 04/12/02 | MDL | 0.50 |
| 04/17/02 | MDL | 0.17 |
| 04/17/02 | MDL | 0.25 |
| 04/18/02 | MDL | 0.17 |
| 05/01/02 | MDL | 0.17 |
| 05/01/02 | CLK | 3.20 |
| 05/03/02 | MDL | 0.50 |
| 05/06/02 | MDL | 0.20 |
| 05/06/02 | MDL | 0.10 |
| 05/06/02 | MDL | 0.33 |
| 05/10/02 | CLK | 2.50 |
| 05/13/02 | CLK | 3.00 |
| 05/19/02 | MDL | 0.20 |
| 05/20/02 | CLK | 3.00 |

| | | |
|---|---|---|
| 05/21/02 | MDL | 1.83 |
| 05/21/02 | CLK | 3.10 |
| 05/22/02 | CLK | 6.60 |
| 05/29/02 | MDL | 0.20 |
| 05/29/02 | CLK | 0.33 |
| 05/29/02 | CLK | 2.90 |
| 05/31/02 | MDL | 0.67 |
| 05/31/02 | MDL | 0.17 |
| 05/31/02 | MDL | 0.25 |
| 05/31/02 | MDL | 0.33 |
| 05/31/02 | CLK | 1.70 |
| 05/31/02 | CLK | 0.80 |
| 06/04/02 | MDL | 0.50 |
| 06/07/02 | CLK | 4.30 |
| 06/10/02 | MDL | 0.33 |
| 06/11/02 | MDL | 2.00 |
| 06/18/02 | CLK | 2.00 |

The Court finds that the time specified in these entries is not sufficiently related to the Second Motion to Compel to justify an award of fees against the University. Many of the entries relate to the main administration of the case, or are tasks which would have been required regardless of the discovery disputes (e.g., time spent reviewing documents once they were produced). This results in a total reduction of 46.55 hours, consisting of 11.1 hours of Mr. Lyons, 1.35 hours for Mr. O'Meilia, and 34.1 hours in law clerk time.

*The Application for Contempt*

■ Under Rule 37(b)(2)

If a party ... fails to obey an order to provide or permit discovery ... the court shall require the party or the attorney advising that party or both to pay reasonable expenses, including attorney's fees, *caused by the failure,* unless the court finds that the failure was substantially justified or that other circumstances make an award of expenses unjust.

FED.R.CIV.P. 37(b)(2) (emphasis added). The question is whether all or any part of the fees incurred in prosecuting the Application for Contempt were "caused by the failure" of the University to abide by the order compelling the University to answer the Disputed Discovery. *See Turnbull,* 893 F.2d at 259 (10th Cir.1990); *see also Liew v. Breen,* 640 F.2d 1046, 1051 (9th Cir.1981); *Toth v. Trans World Airlines, Inc.,* 862 F.2d 1381, 1385–86 (9th Cir.1988) ("[Rule] 37(b)(2) provides for the award of reasonable expenses and attorney's fees 'caused by the failure' to obey a court order to provide or permit discovery. Expenses incurred outside of this particular context are not provided for."); *Brandt v. Vulcan, Inc.,* 30 F.3d 752, 756 (7th Cir. 1994) ("The rule's plain language limits its applicability to situations where a court order has been violated."); *In re Williams,* 215 B.R. 289, 301 (D.R.I.1997) ("It is well settled that a court cannot impose sanctions pursuant to Rule 37(b)(2) unless a specific order ... is issued and then violated.").

Counsel for Ms. Ray seek an award of fees and expenses incurred in their prosecution of the Application for Contempt. Ms. Ray did not prevail upon this Application; the Court declined to hold the University in contempt. The University contends that, as a result, no fees should be awarded with respect to the Application for Contempt. Counsel for Ms. Ray argued that the Application for Contempt was a necessary component of the Second Motion to Compel. They point out that the University failed to produce any documents until after the Application for Contempt was filed, and that meaningful re-

sponses to the interrogatories at issue were not served upon them until June 18, 2002, two days prior to the hearing on the Application for Contempt.

The Application for Contempt was filed on March 5, 2002. Thereafter, in April, the University filed responses to the Disputed Discovery which contained little substance; instead, the University promised to produce responsive documents at a later date. The University ultimately produced its files in May of 2002, after the Court had scheduled the June 20, 2002, hearing on the Application for Contempt. Two days prior to that hearing, the University finally delivered substantive answers to the interrogatories which were part of the Disputed Discovery. Counsel for the University offered no explanation for this delay. The conclusion that the filing of the Application for Contempt and the specter of the June 20, 2002, hearing was a factor in the University's ultimate compliance with the order compelling discovery is inescapable.

The question as to the amount of the award remains. The Court believes that the time spent on the Application for Contempt up to June 18, 2002, should be compensated. After that date, the Disputed Discovery had been substantially complied with, and the expenses incurred by counsel for Ms. Ray could not relate to the obtaining of those discovery responses. Accordingly, the Court declines to award compensation for the following time entries:

| Date | Timekeeper | Hours |
|------|-----------|-------|
| 6/18/02 | MDL | 1.50 |
| 6/18/02 | MDL | 0.75 |
| 6/18/02 | MDL | 0.50 |
| 6/18/02 | MDL | 1.50 |

In addition, the Court finds that all of the time entries contained in Plaintiff's Third Supplement to Motion for Attorney's Fees (*Exhibit 72*) relate to continued prosecution of the Application for Contempt. The Court declines to award compensation for this time. This results in a total reduction of 60.36 hours, consisting of 32.16 hours of Mr. Lyons, 5.0 hours for Mr. Danielson, and 23.2 hours in law clerk time.

*The Appeals*

 Counsel for Ms. Ray also seek to be compensated for their efforts in resisting the University's appeals of the order compelling discovery. The Court declines to do so. While the University ultimately did not prevail on either appeal, no one has found the appeals to be frivolous. The Court is reluctant to enter an order which could be construed as penalizing the University for pursuing its appeal rights. Furthermore, courts in similar situations have failed to award such fees for failure to be encompassed by the plain language of Rule 37. *See Telluride Management Solutions v. Telluride Investment Group,* 55 F.3d 463, 467 (9th Cir.1995), *rev'd on other grounds, Cunningham v. Hamilton County,* 527 U.S. 198, 119 S.Ct. 1915, 144 L.Ed.2d 184 (1999) (Denying sanctions defending a motion to reconsider by stating "[w]e have foreclosed the application of Rule 37 sanctions ... where a party's alleged discovery related misconduct is not encompassed by the language of the rule."). Accordingly, the Court declines to compensate the following time entries:

| Date | Timekeeper | Hours |
|------|-----------|-------|
| 11/21/01 | MDL | 0.50 |
| 11/24/01 | MDL | 0.25 |
| 11/24/01 | KCD | 0.50 |
| 11/26/01 | MDL | 0.25 |
| 11/26/01 | MDL | 0.25 |
| 11/26/01 | KCD | 2.50 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 12/01/01 | KCD | 2.50 | | 01/23/02 | MDL | 2.00 |
| 12/02/01 | KCD | 2.50 | | 01/23/02 | MDL | 1.25 |
| 12/03/01 | MDL | 1.00 | | 03/12/02 | MDL | 0.17 |
| 12/03/01 | KCD | 0.50 | | | | |
| 12/12/01 | MLB | 1.00 | | | | |
| 12/17/01 | KCD | 1.25 | | | | |
| 12/18/01 | MDL | 1.25 | | | | |
| 12/18/01 | MDL | 1.00 | | | | |
| 01/09/02 | MDL | 0.25 | | | | |
| 01/10/02 | MDL | 0.67 | | | | |
| 01/16/02 | MDL | 0.50 | | | | |
| 01/17/02 | MDL | 0.17 | | | | |
| 01/17/02 | KCD | 0.20 | | | | |

This results in a total reduction of 20.46 hours, consisting of 9.51 hours of Mr. Lyons, 9.95 hours for Mr. Danielson, and 1.0 hour for Ms. Blackburn.

*Expenses*

Counsel for Ms. Ray has sought reimbursement of expenses in the amount of $1,137.91. *See Exhibits 71 and 72.* After review, the Court awards all expenses save those incurred with respect to the Application for Contempt after June 18, 2002. The total amount awarded is $1,129.07.

### Conclusion

The Fee Motion is granted in part. The Court awards the following fees:

| Attorney | Time Sought | Deduction | Time Allowed | Rate | Total |
|---|---|---|---|---|---|
| Mr. Lyons: | 129.12 | 67.06 | 62.06 | $200 | $12,412 |
| Mr. Danielson: | 14.45 | 12.95 | 1.5 | $175 | 262.50 |
| Mr. O'Meilia: | 24.4 | 20.45 | 3.95 | $200 | 790 |
| Ms. Blackburn: | 8.75 | 1.0 | 7.75 | $ 50 | 387.50 |
| Law Clerks: | 88.1 | 60.6 | 27.5 | $ 40 | 1,100 |

The total fee award is $14,952.00. In addition, the Court awards expenses in the sum of $1,129.07.

The entire amount is assessed against the University. A separate judgment consistent with this Memorandum Opinion is entered concurrently herewith.